No. 03-452

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 73

McCABE PETROLEUM CORPORATION,

        Plaintiff,

    v.

Easement and Right-of-Way Across
<u>Township 12 North, Range 23 East</u>, PMM
Sections 16-19, Fergus County, Montana,

N BAR RANCH, LLC, and UNKNOWN OWNERS,

        Defendants.

CERTIFIED QUESTION FROM:    The United States District Court,
        District of Montana, Great Falls Division
        The Honorable Sam Haddon, United States District Judge.

COUNSEL OF RECORD:

        For Plaintiff:

                Chris Mangen, Jr.; Crowley, Haughey, Hanson, Toole & Dietrich,
                Billings, Montana

        For Defendants:

                Barry O'Connell; Moore, O'Connell & Refling, Bozeman, Montana

        Submitted on Briefs:  October 30, 2003

        Decided:   March 26, 2004

Filed:

_____
                Clerk

Chief Justice Karla M. Gray delivered the Opinion of the Court.

¶1 McCabe Petroleum Corporation filed an action in the United States District Court for the District of Montana seeking to condemn an access easement and right-of-way across lands owned by N Bar Ranch, LLC. Pursuant to Rule 44, M.R.App.P., the United States District Court certified two questions of Montana law to us, which we restate as follows:

¶2 1. Is exploration and development of a federal oil and gas lease a "mine" which constitutes a "public use" under § 70-30-102(33), MCA?

¶3 2. Does § 82-2-201, MCA, grant the owner of a federal oil and gas lease power as the owner of a "mining claim" to condemn a right-of-way across land of another for access to explore and develop the oil and gas lease?

¶4 Our answer to the first certified question is "no" and, for reasons which will become apparent, we do not address the second question.

BACKGROUND

¶5 McCabe holds United States oil and gas leases covering lands in Fergus County, Montana. N Bar Ranch owns property adjacent to the land covered by McCabe's leases. In its federal court action, McCabe seeks to condemn an easement and right-of-way over the property owned by N Bar Ranch to allow it access to drill and operate oil wells.

¶6 N Bar Ranch moved to dismiss McCabe's condemnation action on the basis that the complaint fails to state a claim upon which relief can be granted under Rule 12(b)(6), Fed.R.Civ.P. N Bar Ranch contended McCabe's proposed activities are not a "public use" within the meaning of § 70-30-102(33), MCA, and that § 82-2-201, MCA, does not grant

2

McCabe the power of eminent domain. Following briefing, the United States District Court certified the above-restated questions to this Court and we accepted them for response.

DISCUSSION

¶7     Is exploration and development of a federal oil and gas lease a "mine" which constitutes a "public use" under § 70-30-102(33), MCA?

¶8     Eminent domain is the right of the state to take private property for public use. Section 70-30-101, MCA. Private individuals and corporations, like state agencies, have no inherent power of eminent domain, and their authority to condemn must derive from legislative grant. *Montana Talc Co. v. Cyprus Mines Corp.* (1987), 229 Mont. 491, 495, 748 P.2d 444, 447.

¶9     The general public uses for which the Montana Legislature has granted the power of eminent domain are enumerated in § 70-30-102, MCA, a statute first enacted in 1877. McCabe argues that an access road to explore and develop landlocked federal oil and gas leases is a "public use" for which the power of eminent domain may be exercised under § 70-30-102(33), MCA, which provides that "roads, tunnels, and dumping places for working mines, mills, or smelters for the reduction of ores" are a public use. McCabe asserts that potential oil wells are "mines" under the above statute. It relies on *Montana Talc* for its substantive argument and also for its contention that the public uses delineated in § 70-30-102, MCA, should be interpreted broadly. We turn first to the latter contention.

¶10     In the 1987 *Montana Talc* decision, 229 Mont. at 498, 748 P.2d at 448, the Court stated it was not aware of any Montana judicial decision declaring that the public uses set

3

forth in § 70-30-102, MCA, are to be strictly construed. While the Court technically may have been correct about the "strictly construed" language, prior authority on the subject apparently was overlooked.

¶11     We addressed the appropriate interpretation of statutory public uses in *State v. Aitchison* (1934), 96 Mont. 335, 30 P.2d 805. In that case, the plaintiffs seeking to exercise the power of eminent domain conceded--based on existing case law--that authority to condemn must be "expressly given or necessarily implied." They sought to proceed on the "necessarily implied" theory. *Aitchison,* 96 Mont. at 337-38, 30 P.2d at 806 (citation omitted).

¶12     In discussing eminent domain powers, we cited to authorities stating clearly that the eminent domain power being against common right, it cannot be implied or inferred from vague or doubtful language, and that the right to exercise that power does not exist when made out only by argument or inference. *Aitchison*, 96 Mont. at 339, 30 P.2d at 807. We also observed that all prior cases had held against extending the right of eminent domain under a theory that the power had been granted by implication. *Aitchison*, 96 Mont. at 340, 30 P. 2d at 807 (citations omitted). Thus, while not using the "strictly construed" language, it is clear that case law prior to *Montana Talc* took a narrow approach to interpreting the statutorily-delineated public uses.

¶13     The *Montana Talc* Court went on to reference § 1-2-103, MCA, to the effect that statutes are to be liberally construed and, in addition, that "[n]o interpretation is required when the plain meaning can be derived from the words of the statute." *Montana Talc*, 229

4

Mont. at 498, 748 P.2d at 449. It is difficult to mesh the *Montana Talc* Court's use of both the"liberal construction" and "plain meaning" terminology. Because of subsequent case law, however, it is unnecessary to attempt to do so.

¶14    In *City of Bozeman v. Vaniman* (1994), 264 Mont. 76, 869 P.2d 790, we again addressed the power of eminent domain. There, a unanimous Court stated clearly and without equivocation that "[t]he legislature's grant of the eminent domain power . . . must be strictly construed." *Vaniman*, 264 Mont. at 79, 869 P.2d at 792 (citation omitted). Because private real property ownership is a fundamental right under the Montana Constitution, "any statute which allows [the taking of] a person's property must be given its plain interpretation, favoring the person's fundamental rights." *Vaniman*, 264 Mont. at 79, 869 P.2d at 792. Thus, while not involving a "public use" issue, *Vaniman* is this Court's latest and clearest statement regarding the interpretation of the power of eminent domain. We conclude, therefore, that fundamental real property rights require that "public uses" for which the power of eminent domain are granted must be interpreted pursuant to the plain language set forth by the Legislature and cannot be implied.

¶15    McCabe's first substantive argument is that *Montana Talc* is controlling authority for its proposition that potential oil wells are "mines." We disagree.

¶16    In *Montana Talc*, we addressed whether the power of eminent domain could be used to condemn land for an open pit talc mine. We determined that, under § 70-30-102(15), MCA (1985), an open-pit excavation necessary to "backslope" the mining of an ore body is an authorized public use. *See Montana Talc*, 229 Mont. at 496, 748 P.2d at 447. Section

5

70-30-102(15), MCA (1985), is now recodified in substantially similar language in § 70-30-102(44), MCA, which provides in pertinent part that authorized public uses are "projects to mine and extract ores, metals, or minerals owned by the condemnor located beneath or upon the surface of property where the title to the surface vests in others."

¶17    In *Montana Talc*, the company seeking condemnation was the owner of the body of talc ore and sought to open-pit mine that ore; to do so, it was necessary for the company to "backslope" the mine over land owned by Cypress Minerals Corporation.  The Court merely applied the statute to the facts before it, and concluded that, "[f]or the purpose of mining that ore body, Montana Talc therefore has the power of eminent domain."  *Montana Talc*, 229 Mont. at 496, 748 P.2d at 447.

¶18    In the present case, McCabe does not rely on § 70-30-102(44), MCA.  Thus, in addition to the facts that *Montana Talc* did not involve oil and gas leases or wells and did not hold that oil and gas exploration is "mining" under Montana's eminent domain statutes, the entire basis of the *Montana Talc* analysis was a different subsection of § 70-30-102, MCA, than is now at issue.  That subsection is not applicable here.  For those reasons, *Montana Talc* is neither controlling nor particularly relevant here.

¶19    McCabe also relies on this Court's statements in *Mid-Northern Oil Co. v. Walker* (1922), 65 Mont. 414, 427, 211 P. 353, 356, and *Rice Oil Co. v. Toole County* (1930), 86 Mont. 427, 431, 284 P. 145, 146, respectively, that "oil is a mineral, and . . . an oil well is a mine[,]" and "[o]il is a mineral and the process of extracting it from the rocks is mining." According to McCabe, these statements support its contention that a mine, as the term is used

in § 70-30-102(33), MCA, includes an oil well and, as a result, it is authorized to proceed to condemn a road needed to develop oil wells pursuant to its federal leases across N Bar Ranch's property. McCabe's reliance on *Mid-Northern* and *Rice* is misplaced.

¶20    In *Mid-Northern*, an oil company sought an injunction restraining the state board of equalization from enforcing an annual license tax against it. *Mid-Northern*, 65 Mont. at 420-21, 211 P. 354. *Rice* involved an action to recover a portion of an oil well net proceeds tax paid to Toole County. *Rice*, 86 Mont. at 430, 284 P. at 145. Thus, in both cases, our characterizations of an oil well as a mine were made within the context of tax litigation, not eminent domain statutes which expressly enumerate the public uses for which condemnation proceedings can be maintained. Definitions from other sources are not readily imported into the eminent domain arena. *See Richter v. Rose*, 1998 MT 165 ¶¶ 18-20, 289 Mont. 379, ¶¶ 18-20, 962 P.2d 583,¶¶ 18-20. One of the reasons, of course, is the clash between real property rights and the power of eminent domain.

¶21    Moreover, the statements in both *Mid-Northern* and *Rice* are premised on *Burke v. Southern Pac. R. Co.* (1914), 234 U.S. 669, 34 S.Ct. 907, 58 L.Ed. 1527, a case in which the United States Supreme Court addressed several questions concerning the Southern Pacific Railroad Company's title to mineral lands patented under the authority of a railroad land grant. One of the issues was whether petroleum or mineral oil was included within the meaning of the term "mineral" as it was used in acts of Congress reserving mineral land from railroad grants. *Burke*, 234 U.S. at 676, 34 S.Ct. at 910, 58 L.Ed. at 1543. The Supreme Court analyzed the issue by addressing the manner in which the term "mineral" had been

used in the federal laws reserving mineral lands from railroad land grants. *Burke*, 234 U.S. at 679, 34 S.Ct. at 911, 58 L.Ed. at 1544. No federal statutes are at issue here. Furthermore, § 70-30-102(33), MCA, unlike § 70-30-102(44), MCA, does not contain the word "mineral."

¶22 McCabe also relies on *Coronado Oil Co. v. Grieves* (Wyo. 1979), 603 P.2d 406, in which the Wyoming Supreme Court held that the interests of a federal oil and gas lessee permit the lessee to condemn private property to obtain a right-of-way to its landlocked oil and gas leases. The *Coronado* court noted that Article I, Section 32 of the Wyoming Constitution allows the taking of private property for private use for private ways of necessity. It determined the Wyoming constitutional provision is broad enough to cover the proposed condemnation activity by the oil and gas lessee. Then, in reaching what it termed "a reasonable and sound construction which carries out the intent of the constitution and related statutes," the court interpreted a Wyoming statute allowing condemnation of roadways for "mining" to include allowing condemnation of roadways for the exploration for oil and gas under a federal oil and gas lease. *Coronado*, 603 P.2d at 410-11. McCabe asserts *Coronado* is "a compelling legal and common sense precedent."

¶23 The eminent domain provision of Montana's Constitution, Article II, Section 29, is not at all similar to the provision of the Wyoming Constitution cited in *Coronado*: Montana's Constitution does not allow the taking of private property for private ways of necessity. Indeed, private ways of necessity in Montana may be obtained only by satisfying several criteria. *See, e.g., Kullick v. Skyline Homeowners Ass'n, Inc.*, 2003 MT 137, ¶ 21, 316

8

Mont. 146, ¶ 21, 69 P.3d 225, ¶ 21; *Loomis v. Luraski*, 2001 MT 223, ¶ 51, 306 Mont. 478, ¶ 51, 36 P.3d 862, ¶ 51.

¶24 Montana's constitutional eminent domain provision provides, in pertinent part, that "[p]rivate property shall not be taken or damaged for public use without just compensation to the full extent of the loss having first been made to or paid into court for the owner." Art. II, Sec. 29, Mont. Const. The primary foci of the constitution are "public use" and "just compensation." No specific "public uses" are contained in the Montana Constitution either expressly or by implication.

¶25 Montana's general, substantive and procedural eminent domain statutes are codified in Title 70, Chapter 30, of the Montana Code Annotated. Section 70-30-102, MCA, enumerates 45 public uses for which the right of eminent domain may be exercised. The public use upon which McCabe relies, subsection 33, was first enacted in 1877 and has been carried forward to the present in essentially the same form. *See* Section 580, p. 189, Montana Territorial Laws of 1877. A general knowledge of Montana history supports the notion that the intent of that mining-related subsection enacted in 1877 was to encompass "hard rock" or "ore" mining, and McCabe presents no argument or evidence suggesting otherwise. Indeed, the language of subsection (33), "*roads, tunnels, and dumping places* for working *mines, mills, or smelters for the reduction of ores*" reflects a legislative focus on the kind of mining-related roads necessary to continue the then-existing mining in Montana. *See* § 70-30-102(33), MCA (emphasis added). The next-enumerated public use, "outlets, natural or otherwise, for the flow, deposit, or conduct of *tailings or refuse matter from mines, mills*

9

*and smelters for the reduction of ores*" reinforces that intent. *See* § 70-30-102(34), MCA (emphasis added). No enumerated public uses in § 70-30-102, MCA, contain explicit language relating to oil and gas wells.

¶26 Title 82 of Montana Code Annotated is entitled "Minerals, Oil, and Gas." Chapter 1 of Title 82, "General Provisions," contains no eminent domain provisions. Thereafter, mining and oil and gas exploration are addressed in separate statutory frameworks. Statutes relating to ore mining, including rights-of-way and eminent domain for roads to work mines, are codified in Chapters 2 and 4 of Title 82, MCA. Oil and gas are governed by Chapters 10, 11 and 15 of Title 82, MCA. The only eminent domain provisions in the oil and gas chapters involve underground storage of natural gas. *See* §§ 82-10-302 through -305, MCA.

¶27 Had the Montana Legislature intended to extend the power of eminent domain to encompass the development of oil wells, it easily could have done so in the portions of Title 82 which apply to the oil and gas industry. It also could have done so in § 70-30-102, MCA. Indeed, the Legislature added numerous new public uses to § 70-30-102, MCA, during the 2001 session and another in the 2003 session. *See* 2001 Mont. Laws 125; 2003 Mont. Laws 451.

¶28 Finally, McCabe relies on *Montana Talc*, 229 Mont. at 497, 748 P.2d at 448 (citing *Butte Anaconda and Pacific Railway Co. v. Montana Union Railway Co.* (1895), 16 Mont. 504, 41 P. 232), for the proposition that it has long been Montana public policy to foster and encourage the development of mineral resources in every reasonable way. We observe that

the discussion to which McCabe refers occurred in the real context of a different subsection of § 70-30-102, MCA, and in the factual context of an ore mine. A court's role in construing statutes is to declare what is in terms or substance contained therein; not to insert what has been omitted. Section 1-2-101, MCA. Moreover, because eminent domain interferes with the fundamental right of private ownership of real property, any statute which allows a condemnor to take a person's property must be strictly construed, giving the statute its plain interpretation, but favoring the person's fundamental rights. *Vaniman*, 264 Mont. at 79, 869 P.2d at 792.

¶29    Under a plain meaning of the legislative language used, we conclude that oil wells are not "mines" under § 70-30-102(33), MCA, to which rights-of-way for roads may be obtained via eminent domain proceedings. We further conclude that exploration and development of a federal oil and gas lease is not a "mine" which constitutes a "public use" under § 70-30-102(33), MCA. Therefore, our answer to the first certified question is no. Because similar reasoning would apply to the second certified question, whether the owner of an oil and gas lease has power under § 82-2-201, MCA--as the owner of a "mining claim"--to condemn a right-of-way, we do not address that question separately.

/S/ KARLA M. GRAY

We concur:

/S/ PATRICIA O. COTTER
/S/ JIM REGNIER
/S/ W. WILLIAM LEAPHART

11

Justice Jim Rice dissenting.

¶30    I dissent.

¶31    The Court here declares that there is no right of eminent domain for oil and gas production, because it is not a "public use."  To arrive at this decision, the Court concludes that *Montana Talc Co. v. Cyprus Mines Corp.* (1987), 229 Mont. 491, 748 P.2d 444, is "neither controlling nor particularly relevant here."  ¶ 18.  The Court further concludes that McCabe is not entitled to relief under the plain language of the eminent domain statutes on the basis of "[a] general knowledge of Montana history."  ¶ 25.  The Court dismisses the other authority offered by McCabe, and then concludes, without reference to specific authority, that "oil wells" are not "mines."  I cannot agree with any of these conclusions.  The Court's decision stands in opposition to our eminent domain law, as well as the sum of our commercial, tax and natural resource law–all of which recognize "oil wells" as "mines."

¶32    *Montana Talc* should not be so easily discarded.  It is, as McCabe correctly recognizes, our most complete statement on Montana's eminent domain law.  It discusses statutory language which we also interpret herein and should not be tossed away as being irrelevant.

¶33    First, *Montana Talc* illustrates that the Court has applied the wrong standard of statutory interpretation herein.  The Court relies heavily on *City of Bozeman v. Vaniman* (1994), 264 Mont. 76, 869 P.2d 790, for the proposition that "any statute which allows a condemnor to take a person's property must be *strictly construed*."  ¶ 28 (emphasis added).  The Court then uses this "strict construction" standard to avoid a general consideration of

12

the meaning of "mines" under § 70-30-102(33), MCA. However, *Montana Talc* instructs quite differently:

> *No Montana judicial decision that we are aware of declares that the public uses described in Section 70-30-102, MCA, must be strictly construed.* . . . If strict construction of public uses for which eminent domain may be had were required by the common law, where the law is declared by statute, common law may be applied only if not in conflict with the statutes. Section 1-1-108, MCA. By law the statutes establish the law of this state respecting the subjects to which they relate and their provisions and all proceedings under them are to be *liberally construed* with a view to effect their objects and to promote justice. Section 1-2-103, MCA.

*Montana Talc*, 229 Mont. at 498-499, 748 P.2d at 448-49 (emphasis added). The seeming conflict between *Montana Talc* and the Court's citation to *Vaniman* is easily resolved by understanding that *Vaniman* had nothing to do with the determination of "public use," but, rather, addressed the procedure by which eminent domain is implemented, a completely different issue. *Montana Talc* explained this difference in statutory construction, noting that, although "public uses" would be liberally construed, "[w]e have, however, held that vigorous compliance with procedures required for eminent domain is commanded." *Montana Talc*, 229 Mont. at 498, 748 P.2d at 448. Here, the Court imports the "strict construction" standard from procedural eminent domain, and erroneously applies it to a substantive issue of eminent domain–the determination of public use.

¶34    The Court also omits the preeminent rule of statutory construction: legislative intent. As *Montana Talc* instructs, "[s]tatutes may not be interpreted to defeat their object or purpose, and *the object sought to be achieved by the legislature is of prime consideration* in interpreting them." *Montana Talc*, 229 Mont. at 498, 748 P.2d at 449 (citing *Dover Ranch*

13

*v. Yellowstone County* (1980), 187 Mont. 276, 609 P.2d 711). Fortunately, we need not look far to determine the Legislature's "object" in this case, because Justice Sheehy, for the *Montana Talc* Court, explained at length the Legislature's intent in enacting the statute we are interpreting today. He stated, in part:

> [T]he intention of the Montana legislature [was] to encourage the development of the mining industry. Understandably so, because the mineral wealth of this Treasure State, so named for its huge store of minerals taken and yet to be taken, is a prime springhead of past and future economic increase for Montanans. In keeping with this outlook, the legislature has given to mining concerns the awesome power to condemn private property for public use in return for just compensation where the ownership of the minerals and of the surface do not coincide. So it is that in addition to the power of condemnation for the mine itself under [the identical predecessor provision], there is further power for the construction of roads, tunnels, ditches and other appurtenances necessary to the mining effort. . . . *Expansion, and not restriction, appears to be the legislative watchword*.

*Montana Talc*, 229 Mont. at 497, 748 P.2d at 448 (emphasis added). Thus, the Court in *Montana Talc* concluded from this legislative intent that the appropriate "rule of construction, sustained by the great weight of well-considered authority" for determination of "public use" in regard to mining, was as follows:

> [P]ublic use must be exercised and can be exercised only so far as the authority extends, *either in terms expressed by the law itself, or by implication clear and satisfactory*.

*Montana Talc*, 229 Mont. at 498, 748 P.2d at 448 (citing *Butte Anaconda and Pacific Railway Co. v. Montana Union Railway Co.* (1895), 16 Mont. 504, 536-37, 41 P. 232, 243) (emphasis added).

¶35    The Court attempts to sidestep the holding in *Montana Talc* by reference to the holding in *State v. Aitchison* (1934), 96 Mont. 335, 30 P.2d 805. Although admitting that

14

*Aitchison* did *not* apply a "strictly construed" standard to the interpretation of "public use" statutes, the Court nonetheless asserts, erroneously, that *Aitchison* stands for the principle that eminent domain cannot be granted by statutory implication. The *Aitchison* Court expressed its reluctance to extend the right of eminent domain by implication, but it reiterated that the correct standard allowed exactly that: "The authority to condemn must be expressly given or necessarily implied. . . . All of our decisions have been in accord . . . ." *Aitchison*, 96 Mont. at 339, 30 P.2d at 807. Thus, as *Montana Talc* correctly recognized, public use for eminent domain purposes has been determined by a rule of construction which requires "terms expressed by the law itself, or by implication clear and satisfactory" since 1895.

¶36    Further, the statute under which the State sought to create a fish rearing pond by eminent domain in *Aitchison* was *completely silent* as to such rights–requiring the State to argue "implication" out of thin air. *Aitchison*, 96 Mont. at 339, 30 P.2d at 807. That is clearly not the case here.

¶37    Considering the correct rule of construction then, what is a "mine" under § 70-30-102(33), MCA? The common and plain meaning of "mine" is simply "[a]n underground excavation used to obtain minerals, ores, or other substances." Black's Law Dictionary 1009 (7th ed. rev. 1999). On this common definition, and considering the Legislature's expansive intent for "public uses" with regard to mining, I would conclude that "mine" necessarily, or at a minimum, "by implication clear and satisfactory," includes "oil wells."

15

¶38 Such a conclusion is, of course, consistent with our statutory and case law: "In the case of *Mid-Northern Oil Co.* v. *Walker*, 65 Mont. 414, 211 Pac. 353, this court held that an oil-well is a mine." *Callender v. Crossfield Oil Syndicate* (1929), 84 Mont. 263, 272, 275 P. 273, 276-77; "Oil is a mineral and the process of extracting it from the rocks is mining." *Rice Oil Co. v. Toole County* (1930), 86 Mont. 427, 431, 284 P. 145, 146 (citing *Burke v. Southern Pac. R. R. Co.* (1914), 234 U.S. 669, 34 S.Ct. 907, 58 L.Ed. 1527); "'Mineral' means . . . gas, oil . . ." § 15-38-103(3), MCA (Chapter 38, Resource Indemnity Trust and Ground Water Assessment); "[O]il, gas and other minerals . . . become personal property (goods) and eligible to be collateral . . ." § 30-9A-102, MCA (annotations) (Uniform Commercial Code); *see also* specific exclusion of oil and gas from mineral definition in statutes governing *metal* mines, "'Mineral' means any ore, rock, or substance, *other than* oil, gas . . ." § 82-4-303(8), MCA (Part 3, Metal Mine Reclamation) (emphasis added).

¶39 I would answer the two certified questions affirmatively.

/S/ JIM RICE

16

Justice John Warner dissenting.

¶40    I agree with Justice Rice's dissent.  I write separately to illustrate what I believe is error in the Court's interpretation of § 70-30-102, MCA.

¶41    The first oil well drilled in the United States was drilled in Pennsylvania in 1859.  As a fuel, oil was originally used as kerosene and later in furnaces.  With the invention of the internal combustion engine in the later 1800's, it became clear that oil would be a highly sought-after commodity.

¶42    In 1914, the U.S. Supreme Court was called upon to decide whether a federal land grant to a railroad company included mineral lands. The issue arose when plaintiff and his associates discovered petroleum and attempted to locate placer mining claims upon the lands patented to the railroad. *Burke v. Southern Pacific Railroad Company* (1914), 234 U.S. 669, 34 S.Ct. 907, 58 L.Ed. 1527.  The *Burke* Court determined that all the issues in the case turned upon the question, "[i]s petroleum or mineral oil within the meaning of the term 'mineral' as it was used in said acts of Congress reserving mineral land from the railroad land grants?" *Burke*, 243 U.S. at 676, 34 S.Ct. at 910.   The *Burke* Court reviewed both scientific and historical evidence.  It culled the decisions of several state courts, various other acts of Congress utilizing the terms "mineral" and "mineral lands," and decisions of the Land Department, all of which had determined that in common usage and understanding, petroleum is a mineral.  Ultimately, the Court determined that mineral lands are all lands "chiefly valuable for their deposits of a mineral character, which are useful in the arts or valuable for purposes of manufacture," *Burke*, 243 U.S. at 676, 34 S.Ct. at 910, (quoting

17

*Northern Pacific Railway Co. v. Soderberg* (1903), 188 U.S. 526, 23 S.Ct. 365, 47 L.Ed. 575), and that petroleum is a mineral. *Burke*, 243 U.S. at 679, 34 S.Ct. at 911. The Court further noted approvingly the Supreme Court of Pennsylvania's statement that "the work of extracting [oil] from the containing rocks [is] 'mining for oil.'" *Burke*, 243 U.S. at 676, 34 S.Ct. at 910, (quoting *Funk v. Haldeman* (Pa. 1867), 53 Pa. 229).

¶43     Cases citing *Burke* include issues of royalty law, conveyancing law, real property law, taxation, etc. And while "[t]he term 'mineral' has been the source of considerable confusion in mineral law litigation nationwide," *Farley v. Booth Brothers Land & Livestock Co.* (1995), 270 Mont. 1, 5, 890 P.2d 377, 379, *Burke*'s conclusion that oil is popularly understood to be a mineral, set precedent for the entire nation. *See U.S. v. Standard Oil Co.* (S.D. Cal. 1937), 20 F.Supp. 427; *Lovelace v. Southwestern Petroleum Co.* (E.D. Ky. 1919), 267 F. 504; *Amoco Production Co. v. Guild Trust* (D.Wyo. 1978), 461 F.Supp. 279; *U.S. v. Southern Pacific Co.* (1919), 251 U.S. 1, 40 S.Ct. 47; *Union Oil Co. of California v. Smith* (1919), 249 U.S. 337, 39 S.Ct. 308; *Rowe v. Chesapeake Mineral Co.* (6th Cir. 1946), 156 F.2d 752; *General Petroleum Corp. of California v. U.S.* (S.D.Cal. 1938), 24 F. Supp. 285; *Brennan v. Udall* (D.Colo. 1966), 251 F.Supp. 12; *Long v. Madison Coal Corp.* (W.D.Ky. 1954), 125 F.Supp. 937; *Estate of Fairbank v. U.S.* (Ct.Cl.1964), 164 Ct.Cl. 1; *Lee v. Straughan* (Ark. 1920), 226 S.W. 171; *Cornwell v. Buck & Stoddard, Inc.* (Cal.App. 1938), 82 P.2d 516; *Mid-Northern Oil Co. v. Walker* (Mont. 1922), 65 Mont. 414, 211 P. 353.

¶44    By 1920, the oil and gas industry was well-established nationwide.[1]    The federal

Mineral Leasing Act of 1920, 30 U.S.C. § 181, et seq., was passed to "promote the mining

of coal, phosphate, oil, oil shale, gas, and sodium on the public domain," 41 Stat. 437 (1920),

and to "promote the orderly development of the oil and gas deposits in the publicly owned

land of the United States through private enterprise." *Harvey v. Udall* (10th Cir. 1967), 384

F.2d 883, 885.  In passing the Mining and Minerals Policy Act of 1970, 30 U.S.C. 21(a),

Congress clearly stated that it was in the country's best interest to "foster and encourage

private enterprise in (1) the development of economically sound and stable domestic mining,

minerals, metal and mineral reclamation industries, [and] (2) the orderly and economic

development of domestic mineral resources . . . ." 30 U.S.C. 21(a).  Section 21(a) goes on

to define "minerals" as "all minerals and mineral fuels including oil, gas, coal, oil shale and

uranium."

¶45    Montana, meanwhile, did not experience its first commercial quantity discovery of

oil until 1913.[2]    In 1921, the Montana Legislature enacted a license tax scheme which

included separate chapters covering coal mines, metalliferous mines, gasoline distributors,

and oil producers. *See* Chapters 182, 183, 185, 186, RCM (1921).  The next year, the

Montana Supreme Court was called upon to interpret the new laws.  In *Mid-Northern*, the

---

[1]  Ross L. Malone, Jr., *Oil and Gas Leases on Federal Lands*, 14 Mont. L.Rev. 20, 20 (1953).

[2]    Id.

oil company balked at the prospect of paying the license tax to the state of Montana under a statute that read as follows:

> Every person engaging in or carrying on the business of producing, within this state, petroleum, or other mineral or crude oil, or engaging in or carrying on the business of owning, controlling, managing, leasing or operating, within this state, any well or wells from which any merchantable or marketable petroleum or other mineral or crude oil is extracted or produced . . . must . . . pay to the state treasurer . . . license tax for engaging in and carrying on such business . . . .

Section 2398, RCM (1921). The case also implicated the recently enacted federal Mineral Leasing Act of 1920. The company argued that because it was a lessee of the federal government under the federal Mineral Leasing Act of 1920, it was an agent of the federal government and could not be taxed by a state. This Court held that the oil company was merely a private contractor dealing with the United States in its proprietary character; that it was not elevated to status of agent by virtue of its lease. *Mid-Northern*, 65 Mont. at 427, 211 P. at 356. In so holding, this Court cited *Burke* and stated:

> It must be conceded that the interests of the United States in the lands covered by plaintiff's leases are mineral in character; that oil is a mineral, and that an oil well is a mine . . . . But mining is not a public utility. It is a private industry, and the exploitation and development of mines are no more governmental functions than the cultivation of the soil or the manufacture of farm machinery.

*Mid-Northern*, 65 Mont. at 427, 211 P. at 356. The Court then went on to conclude that the oil company was required to pay the license tax.

¶46   Contrary to the Court's present interpretation, it is clear that the 1921 state licensing statute was not, by its terms, attempting to limit or define the terms "oil" and "well." It is also clear that the Court in *Mid-Northern* was not attempting to interpret the terms "oil" and

20

"well" as used in the statute. Rather, the Court was clearly comfortable utilizing the terms "mine" and "well" interchangeably, and was clearly not perplexed by the common understanding that "oil" is a "mineral." Since its publication in 1922, *Mid-Northern* has been cited for this premise by numerous courts, treatises, and law reviews,[3] and until today, no one has questioned the general status of oil as a mineral under Montana law.

¶47 Today, however, things change. At ¶ 25, the Court states that "[a] general knowledge of Montana history supports the notion that the intent of that mining-related subsection enacted in 1877 was to encompass 'hard rock' or 'ore' mining, and McCabe presents no argument or evidence suggesting otherwise." The Court is correct that in 1877, the Legislature was focused on hard rock mining. To place this statement in context, however, it must be remembered that Montana did not experience its first major oil discovery until 1913, thirty-six years later. It is not unreasonable that the Legislature did not prospectively provide for an industry that did not exist at the time, and it is reasonable to conclude that the Legislature was paying attention to the nationwide trend in the law, including Montana law, to generally classify oil as a mineral. Paragraph 25 also states that "[§ 70-30-102(33)] . . . has been carried forward to the present in essentially the same form." Clearly, however, after the *Mid-Northern* decision, the Legislature had no reason to amend what is now § 70-30-102(33), MCA, to include in the eminent domain laws specific provisions for land needed

---

[3] *See Ozark Chemical Co. v. Jones* (10th Cir. 1942), 125 F.2d 1; *Carter Oil Co. v. Blair* (Ala. 1951), 57 So.2d 64; *U.S. v. H.G.D. & J. Mining Co. Inc.* (S.D.W.Va. 1983), 561 F.Supp. 315; *Standard Oil Co. of California v. Pastorino* (Nev. 1978), 580 P.2d 118; Herbert Thorndike Tiffany, *Tiffany on Real Property* § 589 (3d ed. 1939); Robert E. Sullivan, *A Survey of Oil and Gas Law in Montana as it Relates to the Oil and Gas Lease*, 16 Mont.L.Rev. 1 (1955).

for roads to access oil wells, because this Court had stated unequivocally that an oil well is a mine. Based on *Mid-Northern*, the Legislature almost certainly concluded that adding a special provision for oil wells would be redundant.

¶48    At ¶¶ 19-20, the Court acknowledges this Court's prior declarations in *Mid-Northern* and *Rice* that "oil is a mineral, and . . . an oil well is a mine." It then tells McCabe that it is wrong to rely on that definition, because an oil well is only a mine when taxes are at issue. The Court by this decision changes eighty-two years of settled law in Montana. In *Rice*, the plaintiff was drilling for oil on two adjoining tracts of land under two separate operating agreements. The plaintiff operated the tracts as one unit to maximize efficiency, and when it came time to pay taxes, attempted to treat both tracts as one "mine." This attempt rested on the long-standing habit of metalliferous miners of consolidating adjoining claims for convenience. In such circumstances, if there were continuity of interest in the claims, and if the work performed on the claims tended to benefit all of the claims in the group, then the claims could be assessed as one "mine." *Rice*, 86 Mont. at 432, 284 P. at 146. The Court did not allow the separate claims in *Rice* to be consolidated into one "mine" for tax purposes because the lessors of the two tracts did not have continuity of interest, and in fact expected the lessee to keep the output of the two tracts separate for royalty purposes. However, there was no indication whatsoever from the Court, that there was any question that an oil well was not a mine. *Rice* drew upon *Burke*, which was not a taxation case, and *Mid-Northern*, as authority for the postulate that oil is a mineral and a well is a mine. Apparently, the *Rice* court was looking for some guidance on the issue, and determined that the U.S. Supreme

22

Court and the Supreme Court of Montana were reasonable guides. The Court in this case, however, discounts *Mid-Northern* and *Rice* because they are tax cases, and also discounts *Burke*, concluding that it is not valuable precedent because it construed federal law not Montana law. The Court's interpretation of these cases is, to say the least, strained, and in my view, incorrect.

¶49 Additionally, *Mid-Northern*, decided in 1922, and *Rice*, decided in 1930, are not the only Montana authorities to follow the oil-as-mineral standard. In *Forbes v. Mid-Northern Oil Co*. (1935), 100 Mont. 10, 45 P.2d 673, the Court was construing Chapters 139 and 140 of the Laws of 1927. Chapter 139 dealt with the statement of gross yields of mines and net proceeds, and how they are computed. In its discussion, the Court made no distinction between an oil well and a mine, stating, "[t]his Act requires the operator of a mine (or oil-well) to make out and deliver to the State Board of Equalization a statement of the gross yield of the minerals from such mine . . . ." *Forbes*, 100 Mont. at 13, 45 P.2d at 675. *See also Byrne v. Fulton Oil Co.* (1929), 85 Mont. 329, 278 P. 514 (construing Ch.140 of the Laws of 1927 which read "Every person . . . mining from . . . any mine whatsoever containing gold . . . petroleum or other valuable minerals . . .). In *Rist v. Toole County* (1945), 117 Mont. 426, 159 P.2d 340, the question was whether a grantee of a landowner's royalty in oil lands could lose his rights by tax sale against the grantor. Throughout the opinion the Court cited statutes, including Article XII, Section 3, of the Montana Constitution of 1889, and cases that referred only to "mines" or "mineral lands," but applied those statutes and cases to questions concerning oil royalties, seemingly oblivious to any

23

possible semantic distinction between "mine" and "well." The dissent went further and quoted *Mid-Northern*, conceding that "oil is a mineral and an oil well a mine." *Rist*, 117 Mont. at 443, 159 P.2d at 347.

¶50    It is the declared policy of this state to properly and efficiently develop our natural resources. Only a terribly strained interpretation of our laws can reach the result the Court reaches today, and I dissent.

/S/ JOHN WARNER